IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re:<br><br>DIAMOND COMIC DISTRIBUTORS, INC., *et al.*<br><br>Debtors. | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered) |
| SPARKLE POP LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>- against -<br><br>ALLIANCE ENTERTAINMENT HOLDING CORPORATION, a Delaware corporation and ALLIANCE ENTERTAINMENT, LLC, a Delaware limited liability company,<br><br>Defendants. | Adv. Proc. No. 25-_____ |

**COMPLAINT**

Plaintiff Sparkle Pop, LLC ("Sparkle Pop" or "Plaintiff"), as against Defendants Alliance Entertainment Holding Corporation and its subsidiary Alliance Entertainment, LLC (collectively "Alliance"), allege as follows:

**INTRODUCTION**

1. This action arises from Alliance's brazen disregard of binding non-disclosure and non-solicitation obligations and its theft of valuable of trade secrets. Alliance posed as a bona fide bidder for the valuable assets of Diamond Comic Distributors, Inc. ("Diamond Comic"), a

distributor of comic books, toys, games, and accessories, undergoing a bankruptcy auction. Despite submitting an initial winning bid to purchase the Diamond Comic assets at auction, Alliance concocted pretextual reasons to refuse closing the transaction.

2. Alliance abused the bankruptcy process to gain inside access to Diamond Comic's employees, trade secrets, and proprietary information, all while delaying the sale of assets to legitimate purchasers. When Sparkle Pop finally closed the sale of Diamond Comic, Alliance pulled the rug out from under both seller and buyer, engaging in a sudden and coordinated raid to poach seven key Diamond Comic sales and marketing employees, effectively hobbling the business. Alliance also exploited its inside knowledge of Diamond Comic's confidential information to usurp key distribution relationships with vendors and customers, further undermining the business.

3. Alliance committed these bad faith acts despite having signed strict non-disclosure and non-solicitation agreements from Diamond Comic that bar its conduct. Alliance has violated these strictures openly, effectively daring its counterparties and victims to sue if they want any hope of redress. This lawsuit responds to that challenge.

**PARTIES**

4. Plaintiff Sparkle Pop is a limited liability company organized under the laws of the State of Delaware. Sparkle Pop is wholly owned by Ad Populum, LLC ("Ad Populum"), a limited liability company organized under the laws of the State of Delaware. The sole ultimate beneficial owner of Sparkle Pop and Ad Populum is Joel Weinshanker, a United States citizen and resident of New York and Florida.

5. Defendant Alliance Entertainment Holding Corporation is, on information and belief, a corporation organized under the laws of the State of Delaware. Its principal place of business is in the State of Florida.

6. Defendant Alliance Entertainment, LLC is, on information and belief, a limited liability company organized under the laws of the State of Delaware.

## JURISDICTION AND VENUE

7. This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland. Under paragraph 36 of the Sale Order (defined below), this Court retained exclusive jurisdiction to, among other things:

> interpret, implement, and enforce the terms and provisions of [the Sale Order] and the APA, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned and sold by the Debtors to Purchaser in accordance with the APA, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale ….

8. Additionally, paragraph 13 of the Sale Order (defined below) provides:

> Subject to the terms, conditions and provisions of this Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Assets to Purchaser in accordance with the terms of the APA.

9. The subject matter of this action relates directly to Alliance's actions to interfere with the transfer of property of Diamond Comic's estate to Sparkle Pop under the APA and is a core proceeding within the meaning of 28 U.S.C. 157(b). This Court has jurisdiction to enforce the Sale Order and resolve disputes related to and arising therefrom. *See, e.g.*, *Jam. Shipping Co. v. Orient Shipping Rotterdam, B.V.* (*In re Millenium Seacarriers, Inc.*), 458 F.3d 92 (2d Cir. 2006);

3

*Halart, L.L.C. v. Indep. Auto Warehouse, Inc.* (*In re Twin B Auto Parts, Inc.*), 271 B.R. 71, 78 n.14 (Bankr. E.D. Va. 2001).

10. Venue of this matter is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. This Court has personal jurisdiction over Alliance because: Alliance unconditionally consented to jurisdiction in Maryland and because Alliance: (a) transacts business in Maryland, (b) regularly solicits business and derives substantial revenue from the state of Maryland, and (c) caused tortious injuries in Maryland through acts within the state as described herein.

## FACTUAL ALLEGATIONS

**A.  Alliance and Sparkle Pop Express Interest in Purchasing the Assets of Diamond Comic and Sign Non-Disclosure and Non-Solicitation Agreements**

12. Diamond Comic is a distributor of tabletop games, board games, card games, miniatures, role playing games, accessories, pop-culture merchandise, comic books, gaming products, collectibles, and graphic novels.

13. By late 2024, Diamond Comic was experiencing financial difficulties. It hired an investment banker, Raymond James & Associates, Inc. ("Raymond James"), to find potential partners interested in purchasing the company's assets.

14. Raymond James prepared investment materials and marketed the assets of Diamond Comic, contacting over 110 prospective purchasers, including Alliance, Ad Populum and Sparkle Pop, and Universal Distributors, Inc. ("Universal"). Raymond James required all interested prospective purchasers to sign a non-disclosure and non-solicitation agreement with Diamond Comic (the "NDA"). The NDA states that it "is for the benefit of [Diamond Comic] and Raymond James and their respective assigns."

15. Upon information and belief, Alliance signed the NDA in October of 2024.

16. Ad Populum, LLC, the parent company of Sparkle Pop, signed the NDA on October 26, 2024.

17. Pursuant to the NDA, Alliance requested and received access to "Evaluation Material," defined as including information relating to Diamond Comic "which is non-public, confidential or proprietary in nature, from officers, directors, employees or agents of the Company." Such information included but was not limited to the identity and roles of key employees, information about critical customers and suppliers, and non-public financial information.

18. Because of the sensitive nature of the information that Alliance received, Alliance agreed that it "shall use the Evaluation Material solely for the purpose of evaluating the Transaction and you shall keep the Evaluation Material confidential" and that it would return or destroy all copies of that information if a transaction was not consummated.

19. Alliance also agreed not to initiate or maintain contact with any officer, director, employee, agent, customer, creditor, supplier, vendor, or other business associate of Diamond Comic or its subsidiaries, without express consent of the company.

20. Furthermore, Alliance agreed that for a period to two years (*i.e.*, until October 2026), it "shall not solicit for employment or, directly or indirectly, hire any employee of the Company or any of its subsidiaries with whom you have had contact during the period of your investigation of the Company or its subsidiaries or whose identity you learned during such period."

### B. Diamond Comic Files for Bankruptcy Protection and Seeks to Auction its Assets

21. On January 14, 2025, Diamond Comic and certain related affiliates each filed a voluntary petition for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court").

22. The day prior to the bankruptcy filing, Diamond Comic executed an asset purchase agreement with Universal, with the intention that the agreement would serve as a "stalking horse bid" for the bankruptcy process.

23. On February 11, 2025, the Bankruptcy Court entered a Bid Procedures Order [Docket No. 136], authorizing an auction of Diamond Comic's assets to the highest or otherwise best bidder.

### C. Alliance Outbids Sparkle Pop and Universal in the Diamond Auction and Then Refuses to Close

24. Sparkle Pop submitted a joint bid proposal with Universal.

25. However, the Sparkle/Universal proposal was outbid by Alliance Entertainment, LLC ("AENT"), a subsidiary of Alliance. On or about March 24, 2025, Raymond James declared AENT the winning bidder and the Sparkle/Universal group the back-up bidder.

26. Over the next few days AENT and Diamond Comic exchanged drafts of a proposed asset purchase agreement. However, AENT insisted on including language that was inconsistent with the agreement placed on record at the auction. Accordingly, Diamond Comic proceeded to seek approval to sell its assets to the Sparkle/Universal group.

27. On April 6, 2025, AENT filed an adversary complaint against Diamond Comic and certain of its affiliates, seeking to be reinstated as the winning bidder.

28. The Bankruptcy Court accepted AENT's position. AENT executed an asset purchase agreement with Diamond Comic with a closing date of April 25, 2025.

29. However, as demonstrated by Alliance's course of conduct, instead of proceeding with the transaction as planned, Alliance used its position as the winning bidder to bully Diamond Comic into making further concessions. Furthermore, Alliance abused the bidding process to obstruct the joint bid of Sparkle Pop and Universal, who genuinely intended to purchase the Diamond Comic assets for fair market value. Alliance's conduct delayed that process, imposing unnecessary costs on Sparkle Pop, Universal, and Diamond Comic. The bidding process also allowed Alliance to obtain key confidential information and trade secrets from Diamond Comic, which it then abused to effectively usurp critical company assets without paying for them.

30. Accordingly, on April 24, 2025, one day before closing, AENT suddenly terminated its asset purchase agreement on spurious grounds, refusing to proceed and close.

**D.  Sparkle Pop and Universal Emerge as the Winning Bidder**

31. Sparkle Pop and Universal promptly stepped into the void left by Alliance's unceremonious and last-minute refusal to close its deal with Diamond Comic.

32. Just three days after AENT terminated its asset purchase agreement, on April 27, 2025, Sparkle Pop executed its own asset purchase agreement ("APA") with Diamond Comic. Alliance was aware of the existence and terms of the APA because it was filed on the docket in the Bankruptcy Court.

33. On May 15, 2025, Sparkle Pop also executed a Transition Services Agreement ("TSA") with Diamond Comic. Alliance was aware of the existence of the TSA because such agreement was referenced and described in the APA. In addition, transition services agreements with terms similar to the TSA are standard and customary when purchasing business assets in bankruptcy, ensuring that sellers keep business critical personnel and processes running "as is" during the transition period following the acquisition. Alliance is familiar with this process from its prior acquisitions.

7

34. Pursuant to the TSA, Diamond Comic agreed to keep business critical personnel and processes running "as is" during the transition period. For example, Diamond Comic agreed to minimize disruption in business operations by providing access to personnel and systems and to safeguard its confidential information.

35. Universal also executed an asset purchase agreement for the Diamond Comic assets not included in the Sparkle Pop APA.

36. Sparkle Pop was willing to pay the substantial consideration in the APA and to close the deal because of the value it placed on the Diamond Comic assets, including its proprietary business knowledge, established relationships, experienced and knowledgeable employees, and trade secrets. Sparkle Pop knew and relied on the fact that Alliance has signed the NDA and thus was legally barred from poaching Diamond Comic employees or from attempting to exploit confidential information it learned from Diamond Comic during the sale process. Had Sparkle Pop believed that Alliance would violate those legal commitments, it would not have agreed to pay the consideration in the APA or close the deal.

37. The Bankruptcy Court approved the Sparkle/Universal proposal and entered the *Order (I) Approving Asset Purchase Agreement Among the Debtors and Sparkle Pop, LLC; (II) Approving Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (III) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 407] (the "Sale Order"), which attached a true and correct copy of the APA, and the transaction closed on May 15, 2025.

38. As quoted above, the Sale Order expressly reserves this Court's jurisdiction over all disputes related to or arising therefrom and further contains a prohibition and injunction against

all third parties from taking actions that would adversely affect or interfere with the sale or transfer of the assets under the APA to Sparkle Pop.

> **E.     Alliance Exploits the Transition to Unlawfully Loot Diamond Comic Trade Secrets and Poach Diamond Comic Employees in Violation of the NDA**

39.     On May 16, 2025, one day after the APA closed, Mike Schimmel, the head of sales at Diamond Comic, abruptly resigned.

40.     On or about May 23, 2025, six other key employees in the sales and purchasing departments of Diamond Comic gave one week's notice of their intent to resign from the company, including the Manager of Sales, Director of Ecommerce Sales, Business Development Manager, the second in command in the purchasing department, a purchasing manager, and an assistant manager in the merchandise team. The simultaneous resignation indicated that the resignations were coordinated.

41.     These employees had access to critical Diamond Comic confidential information and trade secrets, including but not limited to customer lists, vendor lists, and sales data.

42.     Each of the departing employees reviewed and acknowledged the Diamond Comic employee manual, which contained a section on non-disclosure of the company's confidential information, including but not limited to: (a) compensation data; (b) customer lists and information; (c) financial information; (d) marketing strategies; (e) contracts; (f) pending projects and proposals; and (g) vendor lists and information. The employee manual also contained a section about conflicts of interest.

43.     Each of the seven departing employees was hired by Alliance, who exploited their confidential knowledge about Diamond Comic and its staffing to target its key employees, in order to maximize the disruption causes to the continuing Diamond Comic business.

44. Alliance acted in flagrant violation of the NDA by exploiting the Diamond Comics trade secrets to interfere with the continuing Diamond Comic business.

45. In exit interviews on May 30, 2025, Diamond Comic informed each of departing employees of their continuing confidentiality obligations to the company. Several of the departing employees noted in their exit interviews that Alliance had reached out to them with offers for employment.

46. Upon information and belief, Alliance hired the seven departing Diamond Comic employees to gain further access to Diamond Comic trade secrets and confidential information and to abuse said information to unfairly compete with Diamond Comic.

47. One of Diamond Comic's critical distribution channels was Amazon.

48. Alliance has sought to exploit its unlawful conduct to Diamond Comic to usurp its Amazon sales.

49. Alliance has unlawfully thwarted Sparkle Pop from competing in the marketplace, by exploiting the Diamond Comic trade secrets Alliance unlawfully expropriated and using the Diamond Comic employees it unlawfully solicited and hired.

50. Based on discussions with Amazon and at least one of the departing Diamond Comic employees, Sparkle Pop is informed and reliably believes that Alliance has attempted to convince Amazon to discontinue its current business with Diamond Comic and instead to divert that business to Alliance.

51. Joe Lunday, one of the seven former Diamond Comic employees who were hired by Alliance, reached out to his Amazon rep on his last day at Diamond Comic on May 30, 2025, to tell the Amazon rep that: (a) he would staying in the same industry as Diamond Comic at his next job at Alliance; (b) he would be working at Alliance in a similar role as his role at Diamond;

(c) Alliance would be looking to build out their collectible program; (d) all Diamond Comic employees were jumping ship; and (e) going forward, Amazon should buy the items they had been buying from Diamond Comic from Alliance instead.

52. The Amazon representative confirmed to Joel Weinshanker, a principal of Sparkle Pop, that Mr. Lunday told him that all: (a) Diamond Comic employees were jumping ship; and (b) going forward, Amazon should buy the items they had been buying from Diamond Comic from Alliance instead.

53. On June 2, 2025, Saul Ewing, LLP, the law firm of Diamond Comic, sent a cease-and-desist letter to AENT on behalf of Diamond, demanding that AENT comply with the terms of the NDA. As of the filing of this complaint, AENT had not responded.

## COUNT I
### (Violation of the DTSA)

54. Sparkle Pop is the owner of trade secrets that are related to products and services used and intended for use in interstate commerce, including services relating to multi-channel media campaigns across state lines, and relating to products that manufactured, distributed, and sold nationwide (the "Trade Secrets").

55. Such Trade Secrets include or and relate to, among other things: (a) compensation data; (b) customer lists and information; (c) financial information; (d) marketing strategies; (e) contracts; (f) pending projects and proposals; and (g) vendor lists and information.

56. The Trade Secrets derive independent economic value from not being generally known to others and not being readily ascertainable by proper means by others.

57. Sparkle Pop takes reasonable means to protect the secrecy of its Trade Secrets, including by storing such Trade Secrets on secure computer systems and limiting access to such

Trade Secrets on a need-to-know basis, according to established information security policies and procedures.

58. Pursuant to the NDA that Alliance signed in October 2024, Alliance obtained access to the Trade Secrets, while agreeing to maintain their strict confidentiality, to destroy all copies of the information and to refrain from making any use of it.

59. In violation of the Defend Trade Secrets Act, 18 U.S. Code § 1836, Alliance willfully and maliciously misappropriated the Trade Secrets, in bad faith, to generate lucrative profits for itself without having to pay fair compensation for the assets and to maliciously deny Sparkle Pop the fair return from the assets it purchased.

60. By reason of the foregoing, Sparkle Pop is entitled to damages in an amount to be proven at trial, including compensatory damages, a reasonable royalty, as applicable, statutory double damages, and an award of its attorneys' fees and costs.

## COUNT II
**(Violation of the Maryland Uniform Trade Secrets Act)**

61. Sparkle Pop is the owner of Trade Secrets that are related to products and services used and intended for use in interstate commerce, including services relating to multi-channel media campaigns across state lines, and relating to products that manufactured, distributed, and sold nationwide.

62. Such Trade Secrets include or and relate to, among other things: (a) compensation data; (b) customer lists and information; (c) financial information; (d) marketing strategies; (e) contracts; (f) pending projects and proposals; and (g) vendor lists and information.

63. The Trade Secrets derive independent economic value from not being generally known to others and not being readily ascertainable by proper means by others.

64. Sparkle Pop takes reasonable means to protect the secrecy of its Trade Secrets, including by storing such Trade Secrets on secure computer systems and limiting access to such Trade Secrets on a need-to-know basis, according to established information security policies and procedures.

65. Pursuant to the NDA that Alliance signed in October 2024, Alliance obtained access to the Trade Secrets, while agreeing to maintain their strict confidentiality, to destroy all copies of the information and to refrain from making any use of it.

66. In violation of the Maryland Uniform Trade Secrets Act, Md. Commercial Law Code § 11-1201 *et seq.*, Alliance willfully and maliciously misappropriated the Trade Secrets, in bad faith, to generate lucrative profits for itself without having to pay fair compensation for the assets and to maliciously deny Sparkle Pop the fair return from the assets it purchased.

67. By reason of the foregoing, Sparkle Pop is entitled to damages in an amount to be proven at trial, including compensatory damages, a reasonable royalty, as applicable, statutory double damages, and an award of its attorneys' fees and costs.

## COUNT III
### (Tortious Interference with Employment Contracts)

68. Pursuant to the TSA, Sparkle Pop had the right to benefit from the valid employment contracts between Diamond Comic and the seven key departing Diamond Comic employees. Said employment was subject to the Diamond Comic employee manual that required the employees to safeguard and not disclose any of Diamond Comic's confidential information.

69. Alliance was aware of the existence of the employment contracts and the Diamond Comic employee manual as a result of the confidential due diligence that it conducted pursuant to the NDA.

70. Alliance induced the seven departing employees to breach their employment agreements by inducing the employees to provide Alliance with access to Diamond Comic confidential information and Trade Secrets. Alliance did so using wrongful means and without justification, in breach of its own legal and contractual obligations to respect the confidentiality of Diamond Comic's proprietary information and to refrain from soliciting the employees.

71. Sparkle Pop has suffered damages as a result and is entitled to recover such damages in an amount to be proven at trial.

## COUNT IV
### (Tortious Interference with the APA and TSA)

72. Sparkle Pop entered into the APA and the TSA, valid contracts with Diamond Comic. Alliance knew of these agreements because information about them was filed on the docket with the Bankruptcy Court; Alliance, through its counsel of record, received service of the Sale Order, which attached a true and correct copy of the APA [Docket No. 423].

73. Alliance materially interfered with the APA and TSA. As set forth above, Alliance illegally poached seven key Diamond Comic employees and unlawfully exploited its access to Diamond Comic confidential information to undermine the Diamond Comic business and its assets.

74. Alliance's actions adversely affected and interfered with the ability of Diamond Comic to sell or otherwise transfer its assets to Sparkle Pop under the terms of the APA and the TSA. Such actions continue post-closing of the transaction.

75. Alliance did so using wrongful means and without justification, in breach of its own legal and contractual obligations to respect the confidentiality of Diamond Comic's proprietary information and to refrain from soliciting the employees.

76. As a result of Alliance's conduct, Diamond Comic breached the APA by, among other things, failing to deliver the assets in the form and in the value promised. As a result of the breach of the APA, Sparkle Pop suffered damages, including the diminution in the value of the assets purchased, in an amount to be proven at trial.

77. As a result of Alliance's conduct, Diamond Comic breached the TSA by, among other things, failing to provide access to key employees needed to effectuate the transition outlined in the TSA and to provide the other support and services promised in the TSA. As a result of the breach of the TSA, Sparkle Pop suffered damages in an amount to be proven at trial.

## COUNT V
### (Injunctive Relief)

78. Plaintiff is likely to succeed on the merits of their claims, as asserted in Counts I-V above.

79. The NDA signed by Alliance inures to the benefit of Diamond Comic and Raymond James and their respective assigns. In the NDA, a valid contract executed by Alliance, Alliance agreed that upon any breach or attempted breach, money damages would not be a sufficient remedy, and Alliance consented to the entry of equitable relief, including in the form of injunctions.

80. As a result of Alliance's unlawful conduct, Plaintiff has suffered irreparable harm including the loss of key personnel from the Diamond Comic team, and the unauthorized use of its confidential and proprietary information, including its trade secrets.

81. Absent injunctive relief, Plaintiff will suffer irreparable harm in the form of loss of Trade Secrets and irreparable damage to unique business assets.

82. The public interest favors a grant of an injunction because Alliance's conduct undermines the integrity of the bankruptcy process and because there is a general public interest

in the proper enforcement of contractual obligations that facilitate the efficient disposition of assets through bankruptcy auctions.

83. The balance of the equities favors Plaintiff, as the valid owner of the Diamond Comic assets, including but not limited to Diamond Comic confidential information and Trade Secrets. Alliance has no legitimate interest in the exploitation of those assets, after having bid for them, and then made the decision not to close the sale.

## **PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendant Alliance Entertainment as follows:**

A. Award Plaintiff all compensatory damages in an amount to be proved at trial.

B. Enter a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction, enjoining Alliance from:

> a. soliciting current employees of Diamond Comic and continuing to employ former employees of Diamond Comic,
>
> b. soliciting or attempting to solicit any current or former employees of Diamond Comic,
>
> c. soliciting or entering into any business relationships with Amazon or other parties with respect to business involving the Diamond Comic assets, and
>
> d. retaining or making any use of Diamond Comic confidential information or Trade Secrets;

C. Award Plaintiff multiple damages under the DTSA and MUTSA;

D. Award Plaintiff all interest and costs and disbursements, including attorney's fees as authorized by law;

E. Award punitive damages as authorized by law; and

F.       Grant such other relief as it deems necessary and proper.

Dated: June 9, 2025                                  Respectfully submitted,

*/s/ Jonathan Rose*

Ellen E. Dew (Bar No. 28830)
Peter J. Artese (Bar No. 31258)
Jonathan Rose (Bar No. 15138)
DLA PIPER LLP (US)
650 S. Exeter Street, Suite 1100
Baltimore, MD 21202
Tel (Ellen E. Dew): (410) 580-4127
Tel (Peter J. Artese): (410) 580-4112
Tel (Jonathan Rose): (202) 799-4310
ellen.dew@us.dlapiper.com
peter.artese@us.dlapiper.com
jonathan.rose@us.dlapiper.com

**JASON KORAL** (PRO HAC ADMISSION PENDING)
**PRESS KORAL LLP**
641 Lexington Avenue, 13th Floor
New York, NY 10022
Tel: (212) 520-8270
Fac: (347) 342-3882
jkoral@presskoral.com

*Counsel for Plaintiff Sparkle Pop LLC*