Entered: June 5th, 2026
Signed: June 5th, 2026

**SO ORDERED**



DAVID E. RICE
U. S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc. *et al.*, | Chapter 7 |
| Debtors. | (Jointly Administered) |
| Sparkle Pop LLC, a Delaware Limited Liability Company, | |
| Plaintiff, | Adv. Proc. No. 25-00157 |
| v. | |
| Alliance Entertainment Holding Corporation, a Delaware Corporation, and Alliance Entertainment, LLC, a Delaware Limited Liability Company, | |
| Defendants. | |

## ORDER REGARDING DISCOVERY OF
## ELECTRONICALLY STORED INFORMATION

IT IS HEREBY STIPULATED AND AGREED by the Plaintiff, Defendants, and the Intervenor Debtors ("Parties"), through their respective counsel, subject to the approval of the Court, that the following Stipulated Order Regarding the Discovery of Electronically Stored Information (the "ESI Protocol" or the "Protocol") be entered by this Court:

## I.    <u>General Terms</u>

A.    "Native format" means and refers to the format of ESI in which it was originally created or normally kept by the party making the production (the "Producing Party") in the usual course of its business and in its regularly conducted activities.

B.    "Metadata" means and refers to information about information or data about data, and includes without limitation:

    1.    information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage, and/or validity of the electronic file; and/or

    2.    information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

C.    "Static Image" means or refers either (1) to a representation of ESI produced by converting a native file, or (2) to an image created by scanning a hard-copy document, into a standard image format capable of being viewed and printed on standard computer systems.

D.    "Parent" and "Child" documents are documents that contain logical companion documents or sub-documents. The common example is an email with attachments. The email is the parent and the attachments are the child documents.

E.    "Checksum Hash" or "Checksum" is a mathematical system that evaluates the contents of any electronic file and can produce a hash value. That hash value is used to represent and verify that the contents are what they were intended to be. It can also be used for deduplication. In terms of text documents, if even one character is changed, the entire hash is different. This is also known as an "exact duplicate."

F.    "RFC" or "Request for Comment" is the standards upon which the internet communication standards are specified.

## II.    <u>Preservation</u>

A.    The parties shall take reasonable and good faith steps to preserve documents within their possession, custody, or control that they know, or reasonably should know, are relevant to the claims and defenses at issue in this action, and shall continue to preserve such information during the pendency of this action.

B.    The parties are required to act in good faith and shall not transfer ESI to another form solely for the purpose of increasing the burden of discovery for other parties.

C.    The parties agree to take reasonable steps to preserve and collect records in a form that will permit the production of Metadata that is necessary to fulfill their agreement on the form of production, referenced in Exhibit A.

D.    The Parties agree that the following ESI does not have to be preserved or collected because it may not be reasonably accessible:

    1.    Back-up data that are substantially duplicative of data that are more accessible elsewhere; Data maintained or duplicated in any electronic backup system for the purpose of system recovery or information restoration, including but not limited to,

2

system recovery backup tapes or other media, continuity of operations systems, and data or system mirrors or shadows, if such data are routinely purged, overwritten or otherwise made not reasonably accessible in accordance with an established routine system maintenance policy;

2. Unallocated, slack space, deleted data, file fragments, or other data accessible by use of computer forensics;

3. Random access memory (RAM), temporary files, or other ephemeral data (except data captured by ephemeral message platforms/apps) that are difficult to preserve without disabling the operating system;

4. On-line access data, such as temporary internet files, history, cache, cookies, and the like;

5. Data relating to online access, such as temporary Internet files, browser history, file or memory caches and cookies;

6. Data in metadata fields that are frequently updated automatically as part of the usual operation of a software application, operating system or network (e.g., data last opened) provided;

7. Operating system files, executable files, and log files (including web server, web services, system, network, application log files and associated databases, analysis output caches, and archives of such data);

8. Any other file types subsequently agreed to by the parties.

E. Absent a showing of good cause, no party need restore any form of media upon which backup data is maintained in a party's normal or allowed processes, including but not limited to backup tapes, disks, SANS, and other forms of media, to comply with its discovery obligations in the present case. For the avoidance of doubt, CDs, DVDs or other media that are used in the ordinary course of business to store original data shall be searched for responsive material.

## III.   Sources of ESI

A. The Parties agree to exchange a list of custodians likely to have discoverable information, including job title (or former job title), a brief description of custodian's responsibilities, and the employment period for each custodian. The Parties will meet and confer in good faith to reach an agreement regarding the custodians from whom relevant ESI will be collected and searched, and maintain the right to seek relevant ESI from custodians who may not originally have been identified as discovery progresses. Parties will seek to identify and produce all relevant documents from all sources and locations.

B. The time period for ESI searches shall be limited to the time period of September 1, 2024 through the present.

C. To achieve proportional and cost-effective discovery, the parties may agree to limitations on the scope of the search (e.g., time frames, document types, keywords) to reasonably

cull out non-responsive information. The Parties further agree to be bound by the Confidentiality Order during the sharing of ESI. Nothing in this Stipulated ESI Protocol precludes any party from challenging the admissibility, discoverability, production, relevance, or confidentiality of information produced under this protocol or otherwise objecting to its production or use at trial.

D.   The parties may also agree to notify all parties of its use of predictive coding technology to identify documents responsive and unresponsive to Fed. R. Civ. P. 34 requests, and upon request, shall provide a seed set or equivalent to the receiving party sufficient to allow the receiving party to validate the input information used to identify responsive and unresponsive information.

E.   Neither Party may seek relief from the Court concerning compliance with this Protocol unless it has conferred with other affected Parties. If necessary, this Protocol may be amended by written agreement of all Parties.

## IV.   **Search and Review**

A. **Collection.** Each Party will be responsible for reviewing and producing its own documents. The parties acknowledge that consistent with the Sedona Conference Principles, the producing party is in the best position to determine how best to preserve, search and produce its own potentially responsive documents. However, to facilitate a cooperative, efficient, and cost-effective discovery process, the Parties agree to meet and confer about ESI search terms and techniques to demonstrate an agreeable and efficient process.

1. Collect all emails from email accounts in the possession of email custodians believed to contain responsive information provided, however, that, if the designated custodian has an email account containing an insubstantial amount of non-duplicative responsive information the entire account need not be collected. In such circumstances, the responsive ESI must be collected through a reasonable alternative and proportionate method.

2. If responsive information is contained in text messages or messaging applications (e.g., Facebook, WhatsApp, Viber, Snapchat, Hangouts, Messenger), data from current or previous mobile, cell or smartphone devices will be collected through a reasonable and proportionate method.

3. If responsive information is contained in non-cloud based document storage devices (hard drives or media of any kind), a producing party will obtain to the extent possible responsive information from such sources through a reasonable method.

4. If a custodian used organizational chat or messaging applications, including ephemeral messaging applications, (e.g., WhatsApp, Skype, Slack, Salesforce, Teams) or personal chat or messaging applications a producing party will obtain to the extent possible responsive information from such sources through a reasonable method.

5. The Parties shall exchange proposed ESI search terms. The Parties shall then meet and confer to attempt to reach an agreement on the search terms or other techniques to be used to identify potentially responsive documents.

6. To advance the meet and confer, the Parties shall discuss, to the extent not protected by the attorney-client privilege or work product doctrine, whether the search terms should include additional relevant email addresses, acronyms, slang, euphemisms, code words, nicknames, project names, terms of art, industry references, or other language likely to identify responsive documents, including appropriate synonyms for the proposed search terms and variations of search syntaxes. The Parties agree that search term negotiations and discussions of other limiters should be done in good faith and be cooperative in nature. The search term negotiations and identification of further search terms shall be an iterative process meant to identify all potentially responsive documents.

B. **Format**. Except for where indicated in the following paragraphs or specifically requested items by counsel, the default format for production of ESI shall be single-page TIFF+ files with extracted text, if available, and metadata in a load file as agreed by the parties in compliance with the table below.

1. Each document will have text extracted for searching.

2. Metadata will be extracted and formatted into fields specified below and following industry technical standards specified.

| Field Name (* apply only to email messages) | Description of Fields |
|---|---|
| BEGDOC | Beginning Bates number assigned to the document |
| ENDDOC | Ending Bates number assigned to the document |
| PROD_VOLUME | Production volume |
| BEGATTACH | Beginning attachment bates number |
| ENDATTACH | Ending attachment bates number for all attachments |
| FILEEXT | File extension of original document |
| PAGECOUNT | Number of pages per document if known |
| ATTACH COUNT | Number of attachments to document if known |
| FILESIZE | Document file size in bytes |
| DATESENT* | Date that the email was sent (MM/DD/YYYY) |
| TIMESENT* | Time the email was sent (HH:MM:SS) |
| DATERECEIVED* | Date that the email was received (MM/DD/YYYY) |
| TIMERECEIVED* | Time the email was received (HH:MM:SS) |
| MODIFIEDDATE | Date the file was last modified (MM/DD/YYYY) |
| MODIFIEDTIME | Time the file was last modified (HH:MM:SS) |
| AUTHOR | Name of the author of the document |
| FILENAME | File name |
| CREATEDATE | Date document was created |
| CREATETIME | Time document was created |

| Field Name (* apply only to email messages) | Description of Fields |
|---|---|
| LASTEDITEDBY | The person to last edit the document |
| EMAIL SUBJECT* | Subject of the email |
| TO* | Persons who received the email |
| FROM* | Persons who sent the email |
| CC* | All cc: members |
| BCC* | All bcc: members |
| CONFDESG | Confidentiality designation |
| HASREDACTIONS | Indicate for any document whether a redaction has been applied |
| MESSAGEID or INTMSGID | Unique identified for digital message |
| MD5HASH | MD5HASH of electronic loose file or attachments |
| SOURCE | Custodian name (ex. John Doe) or non-custodial source |
| CUSTODIAN_DUPE | Custodians (and non-custodial sources) for globally de-duped documents. Custodian Name separated by a semicolon for multiple values (ex. John Doe; Mary Jane; Sam Jones; R&D shared drive). |
| LOGICAL PATH | The directory structure of the original file(s). Any container name is included in the path. |
| NATIVEFILE | Native file link for files produced in native format. |
| TEXTPATH | Relative path to the document level text file referenced in Production Format paragraph below. |

3. Documents will be virtually "printed out" and Bates Stamped except in cases where the file does not lend itself to be printed; files should be produced as Native with a single page Bates Stamped as a representative of the document. A few examples are: spreadsheets, CADs, databases, movies, or audio recordings.

4. Every page will contain a case-wide and unique Bates Stamp. The Bates Stamp system will conform to the following:

   a. Bates Stamps shall only contain upper and lower case letters, numbers, dashes, and underscores.

   b. For each given Bates Stamp prefix, the numeric padding shall remain the same length.

5. For proprietary items such as security footage and CADs discussion will be required to find a common format that will work for the receiving parties as well as not burdensome for the producing party.

6. **Chat Message Data**. Content such mobile data, text messages, or messages from similar applications, including Instant Messenger, SMS/MMS, Slack, or Google

Hangouts, WhatsApp, Skype, Microsoft Teams, and similar platforms shall be collected and produced in a manner that preserves conversational context, as further set forth herein:

a. **Format**: All Chat Message Data shall be produced using commercially acceptable standard, which consolidates individual messages into a single, chronologically ordered file that presents the conversation thread in a user-readable format.  The data may be produced as Natives and/or TIFF images.

b. **Conversation Grouping**: Chat Message Data shall be grouped by custodian, conversation/channel, and 24-hour intervals, with each file representing all messages within a single conversation that occurred in a given 24-hour period (midnight to 11:59 PM in the custodian's local time zone, unless otherwise agreed).

c. **Chat Message Data Metadata**: Each record must be accompanied by a load file and metadata fields, including at a minimum:

| Field Name | Field Description |
| --- | --- |
| Custodian | Person or other descriptor of the custodial entity or repository |
| Conversation ID or Channel Name | Unique identifier of Conversation |
| Conversation Topic | Conversation Topic or Channel Name, if applicable |
| Message Edited | Username/Date/Time Message Edited, if applicable |
| Reactions | Emoji or status reactions/Username who reacted, if applicable |
| Event Type | Message, File Share, Reaction, Mention, Call Event, etc. |
| Deleted | Y/N |
| Participants | Names of all Participants in the Conversation |
| Message Start Date/Time | Earliest Date and Time of the 24-hour period grouping |
| Message End Date/Time | Latest D Date and Time of the 24-hour period grouping |
| Message Count | Number of messages within the 24-hour period grouping |
| Platform/Source Application | Chat application or Platform |
| Has Attachments (Y/N) | |
| Attachment File Names | Names of the attachments, if applicable |

d. **Attachments**: Any attachments (e.g., images, documents, voice notes) referenced in the Chat Message Data shall be extracted and produced as separate documents, linked to the specific container using standard parent/child relationships in the load file.

e. **Preservation of Display Context:** The visual formatting within the production (e.g., sender identification, message timestamps, reactions,

emojis) should be preserved to the extent supported by the specification and the capabilities of the source platform.

7. In cases where only a paper version is available or a version of an electronic document that was printed out has hand-written notes, it will be scanned and the text will be generated using commercially available OCR technology, with each page Bates Stamped appropriately. Appropriate custodial, date, and location data will need to be supplied within the Metadata, as per the table above.

8. In cases of redaction, then the document can either have the Native edited if it does not lend itself to "printing" or exported to Page Images with the redaction applied and text can either be adjusted or the Page Images can be OCR'd. (Printing out any electronic documents that require redaction and redacting on paper and then scanning back in is not acceptable.) Metadata must be copied over. Finally, a **redaction log** must be supplied, providing the Bates Stamp of the document and a brief justification for the redaction.

C.   **Native Files**. Native file documents, emails or attachments may be included with the electronic production using the below criteria:

1. Excel spreadsheets should be produced in native format (with cells visible).

2. Producing Party.

   a. Documents produced in native format shall be re-named to reflect the production number.

   b. The full path of the native file must be provided in the .DAT file for the NATIVE FILE field.

   c. The confidentiality designation under the Stipulated Protective Order to be entered in this action will be produced in the load file in the CONFIDENTIALITY field.

3. If documents produced in native format are printed for use in deposition, motion or hearing, the party printing the document must print the slip sheet representing the document (which should contain the Bates Stamp and any confidentiality markings) and place as first page to the printed document.

D. **Parent-Child Relationships**:   Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business will be preserved and all non-privileged attachments will be produced if any document in a document "family" is produced.  Privileged portions of a family may be redacted as set forth herein or replaced with a slipsheet, as appropriate. Technical attachments, such as corrupt or unrecoverable encrypted files, to responsive parents will be replaced with a slipsheet and produced in native form upon request. For example, if a Party is producing an email that has attachments, the attachments will be processed in order behind the email. Parent/child relationships will be maintained using the BEGATTACH and ENDATTACH metadata fields.

1. Sometimes child documents are overlooked. If this happens following the production of the files containing embedded objects, sub-documents or links to private documents via URL, a receiving party may make reasonable requests, with respect to specific embedded objects particularly identified in the requests, for production of these embedded objects as stand-alone files. The producing party shall cooperate reasonably in responding to any such requests and produce the embedded objects as stand-alone files.

2. Common situations where there are parent/child relationships include but are not limited to:

   a. Emails with embedded objects and attachments. If the embedded objects are not displayed upon the Static Image, then the object needs to be produced as a child document to the email. Attachments must be produced as a child document as well.

   b. Compressed archives such as Zip, RAR, TAR, etc. shall have the archive as the parent and the contents as the child.

   c. Embedded objects found in files are to be extracted and produced. If an embedded object is excluded from production, Parties must provide a brief justification for the exclusion.

   d. Following production of the files containing embedded objects, a receiving party may make reasonable requests, with respect to specific embedded objects particularly identified in the requests, for production of these embedded objects as stand-alone files. The producing party shall cooperate reasonably in responding to any such requests.

E. **Production File Structure**. The file structure of each of the productions shall have a root folder containing the production. That folder shall be named the production identifier. Within it will be contained:

1. The Load File (DAT file extension) will have its filename that of the production and will be located in the root of the production's directory. This is essentially a spreadsheet that has columns defined by Exhibit A and its contents delimited by the specifications in Exhibit C. This will also contain the extracted Metadata defined;

2. The file that links the page images to the documents within the Load File, also known as the OPTICON file (OPT file extension), will have its filename that of the production and will be located in the root of the production's directory. The structure of this file is defined in Exhibit B;

3. The Static Images will be contained in folder entitled "IMAGES" located in the root of the production's directory. This will contain sub-folders with the Static Images stored within it. Each sub-folder cannot exceed 5,000 TIF/JPEG images (example: \ProductionFolder\IMAGES\01\ABC0001.JPG);

4. The extracted searchable text will be located in a folder entitled "TEXT" located in the root of the production's directory. This will contain sub-folders with the TXT files

stored within it. Each sub-folder cannot exceed 5,000 files (example: \ProductionFolder\TEXT\01\ABC0001.txt); and

5. The native documents will be located in a folder entitled "NATIVES" located in the root of the production's directory. This will contain sub-folders with the native files stored within it. Each sub-folder cannot exceed 5,000 files (example: \ProductionFolder\NATIVES\01\ABC0001.xlsx).

F. **Static Images**. Static Images are fair and accurate representations of each page of a document virtually "printed out". The requirements are as follows:

1. They must have a minimum resolution of 300 dpi (dots per inch);

2. These Static Images can be saved as either a JPEG image file when color is involved or a TIFF Group IV black & white image file for non-color content; and

3. Each Static Image file will be named with the case-wide unique Bates Stamped page they represent. The Bates Stamp will be located on the bottom right-hand corner of the page and any confidentiality markings will be on the bottom left-hand corner.

G. **Text**. Extracted text will be "exported" directly from the document. In cases of being a scanned or a redacted document, then OCR text can be substituted. In either case of extraction or OCR, correct text encoding must be observed, especially in cases such as Asian languages and Emoji's. If text is found to be "garbled" in either the Static Images or the extracted text, then a request for the native version may be required or reproduction of affected Static Images and/or extracted text. Additionally, all embedded web links (URLs) not visible in the Static Image will be supplied in the searchable text.

H. **Checksum Hash**. Parties must agree on a single checksum hash pattern to use for all documents within all subsequent productions. The choices are MD5, SHA1, or SHA256. This will be used for purposes of deduplication, uniqueness and verification across all productions from all parties. The chosen checksum hash will be a representation of the entire document's contents.

I. **De-duplication**. De-duplication will be based on the chosen Checksum Hash pattern, and each Party will disclose the methodology it used, if any, to de-duplicate. However:

1. De-duplication shall be performed only at the Parent Document level so that attachments are not de-duplicated against identical stand-alone versions of such Documents and vice versa;

2. Attachments to emails or other Documents shall not be disassociated from the parent email or Document, even if they are exact duplicates of another Document in the production; and

3. Hard copy Documents may not be eliminated as duplicates of responsive ESI if there is anything written on the hard copy Document that makes it different from the electronic copy. A Party may only de-duplicate "exact duplicate" Documents and may not de-duplicate "near-duplicate" Documents, both of the quoted terms in this sentence being given their ordinary meaning in the eDiscovery field.

4. The remaining version of the document after de-duplication will contain a listing of all custodians and file paths from all of the duplicates removed. This could be on a rolling nature if productions are on a rolling protocol.

J. **Exception Files**. Files that cannot be produced or imaged due to technical difficulties shall be identified as exception files. Common exception files include, without limitation, corruption, password protection, digital rights management, or proprietary software associated to the file. The parties will address on a case-by-case basis any exception files that appear to be significant to this litigation.

## V.   **Email Threads**

A. Email threads are email communications that contain prior or lesser-inclusive email communications that also may exist separately in the party's electronic files. A most inclusive email thread is one that contains all of the prior or lesser-inclusive emails, including attachments, for that branch of the email thread.

B. A Producing Party may use e-mail thread suppression to exclude email from production, provided however, that an email that includes an attachment or content in the BCC or other blind copy field shall not be treated as a lesser-included version of an email that does not include the attachment or content, even if all remaining content in the email is identical. To the extent that a Producing Party uses e-mail thread suppression to exclude email from production, the Producing Party shall produce the metadata for that suppressed email.

C. Following production of the most-inclusive email threads, a receiving party may make reasonable requests, with respect to most-inclusive email threads particularly identified in the requests, for production of individual lesser-inclusive emails. The producing party shall cooperate reasonably in responding to any such requests.

## VI.   **Standard for Addressing Privilege**

A. With respect to privileged or attorney work product information generated after the filing of the complaint, parties are not required to include any such information in privilege logs.

B. The Parties agree that certain privileged communications or documents should not be included in a privilege log: (a) privileged communications and work-product exclusively between a Party and its outside litigation counsel after June 9, 2025; (b) work product of counsel created after June 9, 2025; and (c) any privileged communication or work-product created after June 9, 2025.

C. The privilege log shall identify for each claimed privileged document: (1) a unique document identifier; (2) a description sufficient to allow the Parties to analyze the relevance and claimed privilege; (3) the date of the document; (4) the author of the document; (5) all recipients of the document; and (6) the claimed basis for withholding the document.

D. The Parties agree that a privilege log will be provided within 60 days of substantial completion of the production of documents; provided, however, that all privilege logs will be provided with sufficient time to permit the Receiving Party to review the privilege logs, meet and confer with the Producing Party, and bring any motion regarding those privilege logs prior to the close of discovery.

E.  Information produced in discovery that is protected as privileged or work product shall be immediately returned to the producing party (i) if such information appears on its face that it may have been inadvertently produced or (ii) if the producing party provides notice within 15 calendar days of discovery by the producing party of the inadvertent production.

F.  Nothing in this ESI Protocol shall relieve counsel for any receiving party of any existing duty or obligation, whether established by case law, rule of court, regulation or other source, to return, and not to review, any privileged or work-product materials without being requested by the producing party to do so. Rather, in the event a receiving party becomes aware that it is in possession of what appears to be an inadvertently produced privileged document, then counsel for the receiving party shall immediately: (i) cease any further review of that document; and (ii) notify the producing party of the apparent inadvertent production, requesting whether the producing party intended for the document to be produced. In the event the producing party confirms the inadvertent production of the privileged document, the receiving party shall promptly return or destroy all copies of the inadvertently produced privileged document in its possession and take reasonable steps to retrieve all copies of the inadvertently produced privileged documents distributed to other counsel or non-parties.

## VII.  <u>Costs</u>

A.  Each Party shall bear its own costs of collecting data and applying search terms, or other techniques to be used to identify potentially responsive documents, as provided herein, to its own ESI to develop a set of data to be reviewed for responsiveness, confidentiality and privilege.

## VIII.  <u>Reservation of Rights</u>

A.  Nothing contained herein is intended to or shall serve to limit a Party's right to conduct a review of documents, ESI, or other information (including metadata) for relevance, responsiveness and/or segregation of privileged and/or protected information before production.

| | |
|---|---|
| */s/ Jonathan A. Grasso* | */s/ Jodie E. Bekman* |
| Jonathan A. Grasso, 19278 | Jodie E. Bekman |
| YVS Law, LLC | Gordon Feinblatt LLC |
| 185 Admiral Cochrane Drive, Suite 130 | 1001 Fleet Street, Suite 700 |
| Annapolis, Maryland 21401 | Baltimore, Maryland 21202 |
| Telephone: (443) 569-0758 | Telephone: (410) 576-4082 |
| Email: jgrasso@yvslaw.com | Email: jbekman@gfrlaw.com |

-and-

Jason Koral (*Pro Hac Vice)*
Press Koral LLP
S. Jason Teele (*Admitted Pro Hac Vice*)       641 Lexington Avenue, 13th Floor
Sills Cummis & Gross P.C.                       New York, New York 10022
One Riverfront Plaza                            Telephone: (212) 520-8270
Newark, New Jersey 07102                        Email: jkoral@presskoral.com
Telephone: (973) 643-4779
Email: steele@sillscummis.com                  *Counsel for Plaintiff Sparkle Pop LLC*

-and-

Randy Moonan (*Admitted Pro Hac Vice*)
Sills Cummis & Gross P.C.
101 Park Avenue, 28th Floor
New York, New York 10178
Telephone: 212-500-1557
Email: rmoonan@sillscummis.com

*Counsel for Alliance Entertainment Holding Corporation and Alliance Entertainment, LLC*

13